**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **LEE HO VILLAGE TOWNHOME ASSOCIATION** | § | |
| | § | |
| ***Plaintiff*,** | § | |
| | § | **CIVIL ACTION NO. 4:25-cv-4165** |
| **V.** | § | **JURY** |
| | § | |
| **OHIO SECURITY INSURANCE COMPANY,** | § | |
| | § | |
| ***Defendant*.** | § | |

**DEFENDANT'S MOTION TO DISQUALIFY NATIONAL INSURANCE ADVOCATES FROM SERVING AS COUNSEL FOR PLAINTIFF LEE HO VILLAGE TOWNHOME ASSOCIATION**

Defendant files this Motion to Disqualify Counsel for Lee Ho Village Townhome Association and would respectfully ask the Court to disqualify National Insurance Advocates from representing Plaintiff in this lawsuit.

## I. SUMMARY OF THE ARGUMENT

1. National Insurance Advocates ("NIA") purports to represent Lee Ho Village in this lawsuit. However, it does not answer to Lee Ho Village, instead it answers to Insured Advocacy Group ("IAG"), a nonclient that purchased Lee Ho's claim through a maze of contracts and assignments who now attempts to control: (1) the money; (2) the settlement authority; and (3) Lee Ho's privileged information. Ultimately, the confusing trail of contracts and assignments as discussed below sets up an arrangement that is irreconcilable with NIA's duties to Lee Ho Village and it requires NIA's disqualification.

2. Restore Zone, a contractor, attempted to obtain Lee Ho's post loss insurance rights through an assignment which provided Restore Zone with the purported authority to select the attorney to pursue Lee Ho's claim against OSIC. Here Restore Zone selected NIA

3. Stoploss, a subcontractor hired by Restore Zone, sold the assigned claim to Insured Advocacy Group ("IAG") under the ClaimPay Contracts, which gave IAG the sole right to all proceeds, the collective right to settle, and the right to receive all information connected to collection "even if said information would otherwise be deemed to be protected by the attorney client privilege." NIA has known of this arrangement from the outset but never disclosed it.

4. First, the assignments are invalid. Texas law enforces the policy's anti-assignment clause, including as to post-loss assignments made without the insurer's consent, so IAG, Stoploss, and Restore Zone acquired no valid interest in Lee Ho's claim against OSIC.

5. Second, NIA labors under a concurrent conflict of interest. Model Rules 1.7 and 5.4(c) forbid a lawyer from representing a client when a nonclient who pays or directs the representation controls the lawyer's independent judgment. Here IAG — whose only goal is to collect the account balance it bought — dictates settlement and payment, while Lee Ho seeks to invalidate the very assignments and liens on which IAG's interest depends. NIA cannot serve both.

6. Third, the third-party-payor conditions of Model Rule 1.8(f) are not satisfied: the arrangement interferes with NIA's independent judgment, was never consented to by Lee Ho on an informed basis and affirmatively compels disclosure of privileged information.

7. Fourth, that compelled disclosure independently violates Model Rule 1.6. Disqualification requires only a genuine threat that client confidence will reach a non-client, not proof of actual disclosure — and here the threat is contractually mandated. Because an open and obvious conflict exists among NIA, Lee Ho, and IAG, the Court should disqualify NIA from representing Lee Ho Village in this lawsuit.

## II. BACKGROUND & TIMELINE OF EVENTS

8. Lee Ho reported a claim to OSIC for alleged damage to their property as result of Hurricane Beryl that occurred on or about July 8, 2024. As discussed in OSIC's Motion for Summary Judgment, OSIC issued its coverage decision on July 31, 2024 explaining the claimed damages fell below the Policy's deductible.

9. Lee Ho, after receiving the coverage decision, hired Restore Zone to make repairs associated with Hurricane Beryl to Lee Ho's property. Chuck Tilley, the president of Lee Ho's homeowners association, signed and executed the Restore Zone Contract ("Restore Zone Contract"). *See* Exhibit A, the Restore Zone Contract.

10. On September 19, 2024, Restore Zone hired Stoploss Specialist, LLC ("Stoploss") as a subcontractor to provide water mitigation services at the Lee Ho property and invoices for those services. *See* Exhibit B Restore Zone and Stoploss Work Agreement, Stoploss_OSICSUB-05986[1]. The agreement between Restore Zone and Stoploss was executed on October 7, 2024.

[1] *See* Exhibit 1: Stoploss response to subpoena for Exhibits A-P.

11. However, on September 16, 2024, before Restore Zone hired Stoploss, Stoploss sent a letter to IAG, through a third-party entity ClaimPay. That letter communicated facts about the claim and requested confirmation that the Lee Ho file met all notification requirements to avoid delayed funding by IAG to begin work. *See* Exhibit C; Stoploss_OSICSUB-05986.

12. Also on September 19, 2024, Scott Butaud with Stoploss introduced Plaintiff's retained expert, Erik Murray, to National Insurance Advocates to work on the Lee Ho claim. *See* Exhibit D; Stoploss_OSICSUB-05217. On the same day, in a separate email, Scott Butaud introduced Mike Sico with Team Complete for engineering services. *See* Exhibit E; Stoploss_OSICSUB-06763. Plaintiff's retained engineer in this case is Paul Semmes with Team Complete.

13. On October 2, 2024, Scott Butaud presented a "Carlos Pastor", with ClaimPay, the Restore Zone Contract for the Lee Ho Village claim. *See* Exhibits F; Stoploss_OSICSUB-06969.

14. On October 8, 2024, ClaimPay sent documents to Stoploss regarding the purchase of the Lee Ho Village "deal." *See* Exhibits G; Stoploss_OSICSUB-07845. On the same day IAG signed the Purchase Addendum to be attached to the ClaimPay Contracts identified as SLS-5A, memorializing IAG's purchase of the Stoploss invoices for the Lee Ho project. Stoploss executed the Purchase Addendum on October 10, 2024. *See* Exhibit H; Doc 362-1 Exhibit C at pgs. 51-63.

15. On October 11, 2024, ClaimPay emailed Stoploss stating it would stop all purchases of the invoices presented under the Restore Zone Contract and stated that all future

purchases would be done under the Stoploss contract with Lee Ho Village. *See* Exhibits I; Stoploss_OSICSUB-07848.

16. On October 14, 2024, Scott Butaud presented Carlos Pastor, with ClaimPay with an invoice for the Lee Ho Project. *See* Exhibits J; Stoploss_OSICSUB-07151.

17. On October 17, 2024, Scott Butaud sent an email with Stoploss initial Estimate to National Insurance Advocates. Included on the email was Carlos Pastor with ClaimPay, and Anthony Pastor with National Insurance Advocates. *See* Exhibit K; Stoploss_OSICSUB-07128.

18. On October 18, 2024, Scott Butaud with Stoploss sent an email providing an initial estimate for the Lee Ho Village Project to Mario I. Molina, Esq., with Property Litigation Group, PLLC, and copied Jean Bahier, Carlos Pastor, Anthony Pastor, and John Lewis. *See* Exhibit L; Stoploss_OSICSUB-05986.

19. On October 31, 2024, ClaimPay issued a Second Draw to Stoploss in the amount of $227,006.34 for Invoice SL-241035-R. *See* Exhibit M; Stoploss_OSICSUB-05255.

20. As of November 12, 2024 Stoploss and Restore Zone ceased performing work at the property. *See* Exhibit N; Stoploss_OSICSUB-05223. Lee Ho claims Stoploss, Roof Wrap Services, and Garrett McKenzie were not authorized to perform work at the property. *See* Exhibit R; Lee Ho Village lawsuit against Stoploss.

21. On January 15, 2025, Stoploss filed a mechanic's lien against Lee Ho Village. *See* Exhibits O & P; Stoploss_OSICSUB-05223.

**A. Restore Zone Contract with Lee Ho Village.**

22. The contract Lee Ho entered into with Restore Zone was signed by Chuck Tilly, Lee Ho's acting president of the homeowners association, and Hrant Vardanyan, the managing member of Restore Zone. The contract also contained the following terms:

> **Assignment and Direct Payment Authorization:** Client hereby assigns to Service Provider any and all post loss insurance rights, benefits, causes of action, attorney's fees, and proceeds under Client's property insurance policy up to the amount owed for the Services. Client also hereby instructs and directs Client's insurance carrier to make separate payments directly to Service Provider, or its representative(s). Client makes this assignment and authorization in consideration of Service Provider's agreement to perform services and supply materials and otherwise perform its obligations under this contract.

> **Collection For Services:** Client hereby agrees that in the event that Client's insurance carrier fails to pay the full invoiced amount of the Services, at Service Provider's discretion Client will hire and retain an attorney of Service Provider's choosing (hereinafter "Attorney") in order to collect payment for the Services, and attorney shall be compensated directly from Client's insurance carrier pursuant to all applicable laws.

See Exhibit A; Restore Zone Contract.

23. The above terms of the contract include an Assignment of Benefits provision and Collection for Services Provision. Under the Assignment of Benefits Provision, Lee Ho assigned to Restore Zone any and all post loss insurance rights benefits, causes of action, attorney's fees, and proceeds under Client's property insurance policy up to the amount owed for Restore Zone's Services.

24. Under the Collection for Services Provision, should OSIC not pay the full amount invoiced by Restore Zone, Lee Ho would be required to hire and retain an attorney of Restore Zone's choosing in order to collect payment for the Services. In this case that attorney/law firm was National Insurance Advocates.

25. Based on the September 16, 2024 letter to ClaimPay the contracts were going to be replaced with Stoploss contracts. However, the Stoploss contracts were signed and executed by Hrant Vardanyan with Restore Zone, not any representative of Lee Ho Village.

**B. Stoploss Relationship with ClaimPay and IAG (Schroders)**

26. On August 16, 2023, Stoploss and ClaimPay entered into a contract titled "First-Party Claims Non-Recourse Sale and Assignment Agreement, which could be amended and supplemented from time to time" with purchase addendums ("The ClaimPay Contracts"). *See* Exhibit Q; Doc 362 in Case 26-90386 pending the Southern District of Texas, Bankruptcy Court.

27. The ClaimPay Contracts allowed Stoploss to sell its invoices to Insured Advocacy Group. *Id*. For IAG to purchase an invoice, Stoploss, under the ClaimPay Contracts, was required to secure a contract with a property owner that included an assignment of claims (an "AOC") or a letter of protection ("LOP") for claims that the property owner may have against an insurer in connection with claimed property damage. *See* Exhibit H; Doc. 362-1, Exhibit A, in Case No. 26-90386, pending in the United States Bankruptcy Court for the Southern District of Texas.

28. Specifically, the ClaimPay Contracts include the following terms:

business located in the state of Georgia; and

WHEREAS, Seller has provided, among other ancillary and related services, property damage services to various Customers ("**Services**") in consideration for, in part, Customer's execution of documentation required by this Agreement including, but not limited to, an assignment of benefits and claims (the "**AOC**"), in a form substantially similar to **Exhibit A** hereto, which AOC shall give Seller the right to be reimbursed for the Services directly from the party or parties responsible for payment for the Services; and

WHEREAS, Seller has claims or potential claims pending resolution against various Responsible Parties relating to claims of the Customers for which the Services were provided; and

WHEREAS, Seller is willing to assign, transfer, and sell to Buyer all of its right, title and interest in and to each Account Balance secured by an AOC, for the Accounts listed on the Schedule of Accounts, attached hereto as **Exhibit B**; and

*See* Exhibit H; Doc. 362-1 Exhibit A First Party Non-Recourse Sale Agreement at pg. 1).

6. When required by Buyer to act on behalf of Seller, as its Servicer, in any litigation action to collect any portion of the Account Balances, Seller agrees to irrevocably instruct or immediately inform any lawyer or law firm engaged by the insured for the collection of the Account Balance to; (a) send or issue all payments or proceeds received in connection with the Selected Accounts directly to, and/or in the Buyer's sole name; (b) instruct any lawyer or law firm that Buyer shall have the collective right With the Seller to provide authority to settle any Account Balance With any insurance carrier responsible for the payment Of the Account Balance or the property owner ("**Account Obligor**"); and (c) instruct any lawyer or law firm that Buyer is authorized to receive any and all information in connection with the collection of any Account Balance, even if said information would otherwise be deemed to be protected by the attorney client privilege.

*See* Exhibit H; Doc 362-1 Exhibit C (Purchase Addendums for SLS- 5A & 5B).

29. Thus, each purchase of an invoice pursuant to the ClaimPay Contracts required Stoploss to irrevocably instruct or immediately inform any lawyer or law firm engaged by an insured to: (a) send or issue all payments or proceeds received in connection with the purchased claim directly to IAG and/or in IAG's sole name; (b) recognize that IAG,

collectively with the seller, had authority to settle any purchased claim with an insurance carrier; and (c) recognize that IAG was authorized to receive any and all information in connection with collection of any purchased claim, even if that information would otherwise be protected by attorney-client privilege.

30. Here, the AOB/AOC that Stoploss obtained through the Restore Zone Contract, and later substituted with a Stoploss Contract, allowed Stoploss to: (1) choose the attorney to represent Lee Ho Village in pursuing insurance proceeds; and (2) present and sell the Lee Ho claim to IAG.

31. Here, IAG purchased the Lee Ho invoices from Stoploss, as reflected in the Purchase Addendums and made a part of the ClaimPay Contracts. *See* Exhibit H; Doc 362-1 at Exhibit C; Purchase Addendums for SLS- 5A & SLS-5B.

32. IAG's purchase of the Stoploss invoices transferred the interest in Lee Ho's claim to IAG. Thus, providing IAG with: (1) the sole right to collect all payments made in connection with Lee Ho's claim; (2) the right to provide settlement authority to settle Lee Ho's claim; and (3) the right to receive any and all information in connection with collection efforts of Lee Ho's claim regardless of whether that information would be protected by attorney client privilege.

33. The Addendums also reflect the amount IAG paid to Stoploss for the purchase of the invoice. The first set of invoices were purchased for $560,023.34. *See* Purchase Addendum SLS – 5A. IAG paid Stoploss $227,006.34 for the invoices presented in connection with Purchase Addendum SLS-5B.

### C. Other Lawsuits involving Lee Ho, Stoploss, and IAG.

#### *i. Lee Ho Village v. Stoploss, Restore Zone, and Roof Wrap Services*[2].

34. Lee Ho Village filed suit against Stoploss Specialist, Restore Zone, LLC and Roof Wrap Services, LLC, in the 296th Judicial District of Harris County. In the lawsuit Lee Ho alleged:

- Restore Zone, Stoploss, and Roof Wrap Services had contracts among themselves for labor and materials to the community, and that Restore Zone materially breached by failing to pay Roof Wrap and Stoploss.
- it should not bear responsibility for Restore Zone's subcontractor agreements, and that Restore Zone is liable for the $1,576,766.13 value of labor and materials furnished to it and the project.
- the defendants levied and overcharged amounts it never agreed to, continued working after being told they were unauthorized, and that their accounting and application of charges is unconscionable and unjust.

*See* Exhibit R; Lee Ho's First Amended Petition. Lee Ho also seeks relief from paying the amount alleged to be owed by Restore Zone, Stoploss, and Roof Wrap Services and requests that the mechanic's lien be released.

#### *ii. Stoploss v. Lee Ho Village Condo Owners (Individually)*[3]

35. In January 2026, Stoploss filed suit against the individual owners of the condominium units of Lee Ho Property to enforce their mechanics' lien. *See* Exhibit S; Stoploss Original Petition. The Petition alleges that on or about August 27, 2024, Lee Ho Village Property Owners Association, Inc., ("Lee Ho POA") contracted with Restore Zone,

---

[2] Cause No. 202520043; *Lee Ho Village Property Owners Association, Inc., v. Stoploss Specialist, LLC, Restore Zone, LLC and Roof Wrap Services, LLC*, in the 296th Judicial District of Harris County, Texas.
[3] Cause No. 2026-02635; *Stoploss Specialist, LLC v. Pham Min Nhat, et. al*; in the 55th Judicial District of Harris County, Texas.

LLC to provide storm-damage repair services to the property. And on or about October 7, 2024, Restore Zone hired Stoploss as a subcontractor to provide storm-damage repair services on the Project.

36. From September 2024 through November 2024, Stoploss provided storm-damage repair services and issued invoices for its goods and services but it was never paid for that work. As a result of the nonpayment for the services Stoploss served a Notice of Claim / Pre-Lien Notice on Lee Ho POA and the owners for a claim of $798,465.62 resulting from labor and services for roofing, site preparation, initiating dry-out related to storm damage, and filed a Lien Affidavit (Harris County #RP-2025-16824, Exhibit A). Then on January 20, 2025, it served a further Notice of Claim / Pre-Lien Notice for a claim of $1,576,766.13, and on or about January 23, 2025 filed a second Lien Affidavit.

37. Stoploss is asking the court to declare the mechanics liens against Lee Ho valid and enforceable and issue an order triggering the foreclosure and subsequent sale of the individual units with the proceeds applying to the amount of the lien.

***iii. Stoploss v. Insured Advocacy Group.***[4]

38. Stoploss sued Insured Advocacy Group and Insured Advocacy Group II, in the Southern District of New York on August 1, 2025 for breach of contract and tortious interference. In that lawsuit, Stoploss alleged that IAG pursuant to the First Party Claims Non-Recourse Sale and Assignment Agreement, would identify restoration projects, then

[4] Case No. 1-25-cv-06339; *Stoploss Specialist LLC v. Insured Advocacy Group, LLC Insured Advocacy Group II*, LLC; In the United States District Court for the Southern District of New York.

introduce Stoploss to those projects, and encourage Stoploss to secure the job and promise funding.

39. Stoploss also asserts that IAG prior to purchasing the invoices would conduct due diligence confirming insurance coverage, liens, and collectability prior to funding. One of the projects including in the suit was the Lee Ho Village project. *See* Exhibit T Stoploss Original Complaint Against IAG.

40. The lawsuit filed by Stoploss in New York was ultimately transferred to Chapter 11 bankruptcy proceeding pending the Southern District of Texas Bankruptcy Court Houston Division.[5] In the Bankruptcy Proceedings, IAG filed a Motion to Compel Arbitration of Objection to Proof of Claim seeking to compel Stoploss to arbitrate the dispute involving several properties including the Lee Ho property. *See* Doc. 312 of the Bankruptcy Proceeding. In a separate filing titled IAG's Reply in Support of said Motion IAG argued that the ClaimPay Contracts specifically Paragraph 4 of the Purchase Addendums allowed IAG at its sole discretion in the event of default may choose to substitute as the Party in any litigation action filed in connection with collection of the purchased invoices, if needed to protect its interest. *See* Exhibit Q Doc 362 at pg. 5.

41. In the same Motion, IAG argues that IAG may substitute as a party for Stoploss in any litigation action filed by Stoploss against a homeowner or against the homeowner's insurer to collect monies with respect to the invoices purchased. *Id*. Attached to IAG's Reply as exhibits were: (1) The ClaimPay Contracts; (2) Purchase Addendum SLS-5A for

[5] Case No. 26-90386 (ARP); *In re TM36 LLC et al.*, In the United States Bankruptcy Court For the Southern District of Texas, Houston.

the Lee Ho Project and associated spreadsheet identifying the HO Attorney as Anthony Pastor; and (3) Purchase Addendum SLS-5B for the Lee Ho Project and associated spreadsheet identifying the HO Attorney as Anthony Pastor. *See* Exhibit H Doc 362-1 Exhibit C at pgs. 51-63.

42. In the same proceeding, the lawsuit Lee Ho Village filed against Stoploss has been since been removed from Harris County District Court and joined with the Bankruptcy Proceeding where IAG is trying to enforce its interest the Lee Ho claim. *See* Exhibit U; Doc. 1 Case No. 26-03597 (ARP).

***iv. The Issues With NIA's Representation in This Lawsuit***

43. Based on the foregoing, contracts, lawsuits, and facts surrounding the claim that forms the basis of this suit, Lee Ho Village has lost its right to provide settlement authority. Lee Ho is not entitled to receive any insurance proceeds paid in connection with this claim, if any. And more importantly, any information that would be protected by attorney-client privilege is now required to be disclosure to IAG.

44. Said another way, National Insurance Advocates, its associates with Property Litigation Group and others, were chosen by Restore Zone as the attorneys to represent Lee Ho in this lawsuit. NIA was aware of IAG's purchase of the Stoploss invoices from the very beginning yet never disclosed IAG's interest in this lawsuit. NIA has been required to provide IAG all information regardless of attorney client privilege with Lee Ho Village. IAG not Lee Ho Village controls Settlement Authority. IAG is the only entity entitled to any insurance proceeds paid, if any, in connection with this claim.

45. These issues are in direct contradiction to both the Texas & Model Rules of Professional Conduct and should lead to the disqualification of National Insurance Advocates from representing Lee Ho Village in this lawsuit.

## III. ARGUMENT & AUTHORITIES

### A. ANTI-ASSIGNMENT CLAUSES ARE ENFORCEABLE UNDER TEXAS LAW

46. Texas courts have consistently enforced anti-assignment clauses in insurance policies. *See Keller Founds., Inc. v. Wausau Underwriters Ins. Co*., 626 F.3d 871, 875–76 (5th Cir.2010); *Conoco, Inc. v. Republic Ins. Co*., 819 F.2d 120, 123–24 (5th Cir.1987) (citing *Dallas Cnty. Hosp. Dist. v. Pioneer Cas. Co*., 402 S.W.2d 287, 288 (Tex. Civ. App.- Fort Worth 1966, writ ref'd n.r.e.).

47. In fact, the Fifth Circuit has specifically held that non-assignment clauses are enforceable in Texas even for post-loss assignments and without requiring the insurer to establish prejudice. *See Keller*, 626 F.3d at 875–76. Moreover, "Texas courts [generally] uphold anti-assignment provisions so long as they do not interfere with the operation of a statute." *Choi v. Century Surety Co.*, No. H–10–528, 2010 WL 3825405, *4 (S.D. Tex. Sept.27, 2010) (citing *Tex. Dev. Co. v. Exxon Mobil Corp*., 119 S.W.3d 875, 880 (Tex. App.- Eastland 2003, no pet.) (citing *Reef v. Mills Novelty Co*., 126 Tex. 380, 89 S.W.2d 210, 211 (Tex.1936))).

48. For example in *Paramount Disaster Recovery, Inc., v. Acis Surplus Ins. Co*., Judge Hoyt examined the exact language present here, which stated:

> Your rights and duties may not be transferred without our written consent except in the case of death of an individual insured....

3875357, *3 (S.D. Tex. Aug. 31, 2011). Judge Hoyt held the anti-assignment clause was valid and the assignment of the named insured's rights to Paramount without Axis's consent the assignment was invalid, and Axis was entitled to judgment as a matter of law. *Id*. at *4.

49. Here, it is clear Stoploss, Restore Zone and IAG all take the position that Lee Ho's claim has been assigned. Despite their arguments in the other proceedings, the assignment is not valid under this subject policy. And based on the foregoing, any assignment of Lee Ho's claim to Restore Zone, Stoploss and IAG should be deemed invalid due to the anti-assignment language in the policy and OSIC's lack of consent to any assignment.

### B. NIA Should Be Disqualified From Representing Lee Ho in This Lawsuit.

50. "Motions to disqualify are substantive motions affecting the rights of the parties and are determined by applying standards developed under federal law." *In re Dresser Indus., Inc*., 972 F.2d 540, 544 (5th Cir. 1992). " 'Disqualification cases are governed by state and national ethical standards adopted by the court.' " *FDIC v. U.S. Fire Ins. Co*., 50 F.3d 1304, 1311–12 (5th Cir. 1995) (quoting *In re Am. Airlines, Inc*., 972 F.3d 605, 610 (5th Cir. 1992)). "A district court is obliged to take measures against unethical conduct occurring in connection with any proceeding before it," but "depriving a party of the right to be represented by the attorney of his or her choice is a penalty that must not be imposed without careful consideration." *Maersk Tankers MR K/S v. M/T Swift Winchester*, 655 F. Supp. 3d 554, 558 (S.D. Tex. 2023) (quoting *In re ProEducation Int'l, Inc*., 587 F.3d 296, 299–300 (5th Cir. 2009)).

51. Given the severity of disqualification, "courts should not apply disqualification rules mechanically, but consider all of the facts particular to the case ... in the context of the relevant ethical criteria and with meticulous deference to the litigant's rights." *Maersk Tankers*, 655 F. Supp. 3d at 558 (quoting *In re ProEducation Int'l, Inc.*, 587 F.3d at 299–300).

52. "Motions to disqualify are subject to an exacting standard both to protect a party's right to counsel of choice as well as to discourage the use of such motions as a 'dilatory trial tactic.' " *Stonecoat of Tex., LLC v. Procal Stone Design, LLC*, No. 4:17-CV-00303, 2019 WL 9899506, at *7 (E.D. Tex. Mar. 8, 2019) (quoting *Jackson v. City of Sherman, Texas*, No. 4:16-CV-774-KPJ, 2018 WL 621259, at *2 (E.D. Tex. Jan. 30, 2018)). The movant "bears the burden of proving that disqualification is warranted, and that burden is heavy,"…"especially where a party files a motion to disqualify opposing counsel, as opposed to a client's motion to disqualify his own counsel" because "motions to disqualify from an opponent have the potential to be used as procedural weapons advancing purely tactical purposes, such as delay or harassment." *Galderma Labs., LP v. Actavis Mid Atl. LLC*, 927 F. Supp. 2d 390, 395 (N.D. Tex. 2013) ("When the Model Rules are invoked as procedural weapons, the party subverts the purpose of the ethical rules.")).[6]

53. When considering disqualification, the Courts rely on: (1) the local rules in the district; (2) the American Bar Association's ("ABA") Model Rules of Professional

[6] *Marquis v. Sadeghian*, No. 4:19-CV-626-RWS-KPJ, 2021 WL 4148754, at *3 (E.D. Tex. Sept. 13, 2021) (quoting *Spears v. McCraw*, No. A-17-CA-1105, 2020 WL 589538, at *2 (W.D. Tex. Feb. 5, 2020) (citing *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 646 F.2d 1020, 1028 (5th Cir. 1981)); citing *Taylor v. Acad. Partnerships, LLC*, No. 3:19-CV-01764-K-BN, 2019 WL 6619808, at *9 (N.D. Tex. Nov. 5, 2019), adopted, No. 3:19-CV-01764-K, 2019 WL 6619385 (N.D. Tex. Dec. 4, 2019);

Conduct; (3) the ABA's Model Code of Professional Responsibility; and (4) the state rules of conduct. *Stonecoat*, 2019 WL 9899506, at *7 (citing *Jackson*, 2018 WL 621259, at *2 (citing *Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 266 (5th Cir. 2001); *Ayus v. Total Renal Care, Inc*., 48 F. Supp. 2d 714, 714 (S.D. Tex. 1999))).

54. The Texas Disciplinary Rules of Professional Conduct serve as the minimum ethical standard of conduct for attorneys who appear in the Southern District of Texas, but courts in the Southern District of Texas are not limited to the Texas Rules. S.D. Tex. Local R. app. A, R.1A; *Davila v. Webb Cnty*., No. CV L-12-42, 2013 WL 12142347, at *1–2 (S.D. Tex. July 26, 2013) (citing *In re American Airlines, Inc*., 972 F.2d at 610) (the Texas Rules and the Model Rules do not differ materially in their approaches to addressing conflicts of interest); *see also In re ProEducation Int'l, Inc*., 587 F.3d at 299 (the Fifth Circuit also recognizes the ABA Model Rules of Professional Conduct as "the national standards to consider in reviewing motions to disqualify.").

55. "A court must take into account not only the various ethical precepts adopted by the profession but also the social interests at stake... including whether a conflict has (1) the appearance of impropriety in general, or (2) a possibility that a specific impropriety will occur, and (3) the likelihood of public suspicion from the impropriety outweighs any social interests which will be served by the lawyer's continued participation in the case." *In re MMA L. Firm, PLLC*, 660 B.R. 128, 134 (Bankr. S.D. Tex. 2024).

### C. A Conflict of Interest Exists Because a Nonclient Controls the Representation in Violation of Model Rules 1.7 & 5.4.

56. NIA must be disqualified pursuant to Model Rules 1.7(a) & 5.4(c) because a conflict of interest exists between Lee Ho and NIA's other client IAG. The AOB and AOC pits Lee Ho and NIA against one another because Lee Ho's claims and IAG's purchase of the Stoploss invoices both seek to recover insurance proceeds from Defendant. However, Lee Ho is seeking to invalidate the AOB/AOC and its contract with Restore Zone. This conflict will materially limit NIA's responsibilities to Lee Ho because IAG's financial interest in the outcome. NIA's concurrent representation of Lee Ho and IAG poses the exact conflict of interest considered by Model Rule 1.7(a)(2).

57. The present case strikes the Court as exactly the type of circumstances under which a disinterested lawyer would conclude that a client should not agree to his or her lawyer's representation of an additional client with adverse interests. *See Waneck v. CSX Corp.*, No. 1:17-CV-106-HSO-JCG, 2017 WL 11695758, at *8 (S.D. Miss. Aug. 25, 2017), adopted, No. 1:17CV106-HSO-JCG, 2017 WL 5157394 (S.D. Miss. Nov. 7, 2017) (Fifth Circuit precedent instructs that "[a]n actual conflict exists if counsel's introduction of probative evidence or plausible arguments that would significantly benefit one defendant would damage the defense of another defendant whom the same counsel is representing.)

58. Courts have the duty to act where there is an "unethical change of sides that is manifest and glaring" or "open and obvious." *In re Yarn Processing Pat. Validity Litig.*, 530 F.2d 83, 88 (5th Cir. 1976). A motion to disqualify "is the proper method for a party-litigant to bring the issues of conflict of interest or breach of ethical duties to the attention

of the court," and the court's obligation to address unethical conduct exists independent of who raises it. *In re Am. Airlines, Inc*., 972 F.2d 605 (5th Cir. 1992))

59. Under the national standard the Fifth Circuit applies, "[a] lawyer shall not permit a person who recommends, employs, or pays him to render legal services for another to direct or regulate his professional judgment in rendering such legal services." *See* Model of Professional Conduct Rule 5.4(c). The Restatement states the same principle: a nonclient may direct the representation only if "the direction does not interfere with the lawyer's independence of professional judgment," is "reasonable in scope and character," and "the client consents." *See* Restatement (Third) of the law Governing Lawyers § 134.

60. The arrangement between NIA and IAG offends that standard at its very core. The Restore Zone contract and Stoploss's subsequent sale of the AOB and AOC empowered the contractor to select "an attorney of Service Provider's choosing" to pursue Lee Ho's claim. Through the Sale Agreement and Purchase Addendums, Lee Ho's interest in the claim passed to IAG without Lee Ho's consent, which entitled IAG to be paid all proceeds recovered from Defendant and shifted any ability to control settlement to IAG.

61. A lawyer whose engagement, compensation, and settlement authority is subject to a nonparty (i.e., IAG) cannot exercise the independent professional judgment the rule demands. The direction here is neither confined to matters IAG may properly control nor consent to on an informed basis; it reaches the client's core decisions, including settlement. *See* Restatement (Third) of the law Governing Lawyers § 134.

62. A concurrent conflict of interest exists where "there are significant risk that the representation of one or more clients will be materially limited by the lawyer's

responsibilities to … a third person or by personal interest of the lawyer." *See* Model Rule of Professional Conduct 1.7(a)(2). Payment "from a source other than the client" is permissible only where it "does not compromise the lawyer's duty of loyalty or independent judgment to the client"; where it "presents a significant risk that the lawyer's representation of the client will be materially limited," the lawyer must satisfy the conflict rule's consent requirements before proceeding. *See* Comment to Rule 5.4, ("[t]he provisions of … Rule 5.4 express traditional limitations on sharing fees. These limitations are to protect the lawyer's professional independence of judgment. Where someone other than the client pays the lawyer's fee or salary, or recommends employment of the lawyer, that arrangement does not modify the lawyer's obligation to the client.)

63. NIA's obligations to IAG are directly at odds with Lee Ho's interests. IAG's sole objective is to recover the account balance it purchased from Stoploss and to control settlement to that end. Compared to Lee Ho's objective, as its own lawsuit against Stoploss and IAG's counterparties shows, is to invalidate the contract with Restore Zone and the liens placed on the property by Stoploss and other entities.

64. This exact conflict was contemplated by Bankruptcy Judge Eduardo V. Rodriguez in *In re MMA Law Firm, PLLC*, where the same MMA law firm, discussed above, moved to disqualify a law firm it had previously sought to represent MMA, from representing its largest unsecured creditor, litigation funder, B.E. Blank/Equal Access for Justice. *In re MMA L. Firm, PLLC*, 660 B.R. 128, 137 (Bankr. S.D. Tex. 2024).

65. During talks with the law firm, MMA communicated its ligation strategy to the law firm before mediation with the creditor. *Id*. at 133, 136-37. The creditors then retained the

same law firm to represent the official committee of unsecured creditors against MMA. *Id*. at 131. Judge Rodriguez, agreed with MMA and determined the law firm had "an undeniable conflicted duty of loyalty to main that confidence to the Debtor [MMA] and to disclose it to B.E. Blank/Equal Access for Justice and the rest of the general unsecured creditor body, including, among other things, litigation strategies and the details of claims held by and against the Debtor with respect to creditors and how to pursue/defend against them. *In re MMA L. Firm*, PLLC, at 137 (Bankr. S.D. Tex. 2024).

66. The same should apply here, NIA in this instance cannot simultaneously maximize Lee Ho's recovery of insurance benefits, if any, and serve a IAG whose settlement priorities and privilege demands cut against the Lee Ho's own interest. NIA's failure to properly disclose IAG's interest confirms its absence. Additionally, Stoploss's lawsuit against Lee Ho to enforce the liens has now been added to Stoploss's bankruptcy proceeding where IAG is trying to enforce its purchase of the AOB/AOC involving of Lee Ho's claim.

### D. THE THIRD-PARTY-PAYOR CONDITIONS OF MODEL RULE 1.8(F) ARE NOT MET.

67. A lawyer "shall not accept compensation for representing a client from one other than the client unless: (1) the client gives informed consent; (2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and (3) information relating to representation of a client is protected as required by Rule 1.6." *See* Model Rules 1.8(f) and Rule 5.4(c)

68. The IAG arrangement fails each condition: it is built on interference with the lawyer's independence — IAG directs payment and settlement — and it expressly contemplates the delivery of privileged information to IAG. The Restatement confirms that

a payer may not condition the representation on control of matters reserved to the client. *See* Restatement (Third) of the law Governing Lawyers § 134. The third-party-payor rule cannot save a representation structured to violate the very conditions the rule imposes.

### E. NIA IS COMPELLED TO DISCLOSE LEE HO'S CONFIDENTIAL CLIENT INFORMATION, IN VIOLATION OF MODEL RULE 1.6.

69. Even where a third person pays for or directs a representation, "a lawyer must protect the confidential information of the client," and consent to the payment "does not by itself constitute informed consent to the lawyer's revealing such information to that person." Restatement (Third) of the law Governing Lawyers § 134.

70. The Model Rules likewise require that information relating to the representation be "protected as required by Rule 1.6." *See* Model Rules 1.8(f) and Rule 5.4(c). The Purchase Addendums do the opposite: they affirmatively obligate the delivery of information to IAG "even if said information would otherwise be deemed to be protected by the attorney client privilege."

71. Disqualification does not require proof that confidence has already changed hands. The test "is met by demonstrating a genuine threat of disclosure, not an actual materialized disclosure," and "actual disclosure of confidences need not be proven before disqualification is required." *In re Hoar Const., L.L.C.*, 256 S.W.3d 790,805 (Tex. App. 2008). Here, the genuine threat that confidential client information will be revealed to a nonclient is not merely reasonable; it is contractually mandated. As such NIA should be disqualified from representing Lee Ho in this lawsuit.

## IV. CONCLUSION

Based on the foregoing, Defendant requests that NIA be disqualified from representing Lee Ho Village in any capacity in this lawsuit as there is an open and obvious concurrent conflict of interest between NIA, Lee Ho and IAG.

Respectfully submitted,

**THOMPSON, COE, COUSINS & IRONS, LLP**

*/s/ Kolby J. Keller*
Jonathan Peirce
State Bar No. 24088836
Southern District No. 2303246
jpeirce@thompsoncoe.com
4400 Post Oak Parkway, Suite 1000
Houston, Texas 77027
Telephone: 713-403-8210
Facsimile: 713-403-8299

AND

Kolby Keller
State Bar No. 24119382
Southern District No. 3676114
kkeller@thompsoncoe.com
700 N. Pearl Street, 25th Floor
Dallas, Texas 75201
Telephone: 214-871-8200
Facsimile: 214-871-8209
**ATTORNEYS FOR DEFENDANT OHIO SECURITY INSURANCE COMPANY**

**CERTIFICATE OF CONFERENCE**

I, Kolby J. Keller, counsel for Defendant, hereby certify that on the 19th day of October, 2026, I personally spoke with Plaintiff's Counsel, Anthony Pastor about this Motion. Mr. Pastor stated he is opposed to this Motion. Therefore, this Motion is being presented as opposed.

*/s/Kolby J. Keller*______
Kolby J. Keller

**CERTIFICATE OF SERVICE**

I hereby certify that on the 19th day of October, 2026, a true and correct copy of the foregoing document was electronically served on counsel for Plaintiff below in accordance with the Federal Rules of Civil Procedure:

**NATIONAL INSURANCE ADVOCATES, LLP**
Anthony Pastor, Esq
Joseph Varona
Erik Barnard
6330 Manor Lane
Suite 200
Miami, FL 33143
Telephone: 833-701-4110
service@nia.law
anthony@nia.law
jv@plglawyersfl.com
eric@nia.law
***Attorneys for Plaintiff***

*/s/Kolby J. Keller*______
Kolby J. Keller