**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| LEE HO VILLAGE TOWNHOME ASSOCIATION<br><br>Plaintiff(s),<br>v.<br><br>OHIO SECURITY INSURANCE COMPANY<br><br>Defendant(s). | Case No.: 4:25-CV-4165 |

**PLAINTIFF LEE HO VILLAGE TOWNHOME ASSOCIATION'S MOTION TO EXCLUDE OR LIMIT THE TESTIMONY OF DEFENDANT'S RETAINED EXPERTS BRADLEY EAST, P.E., DAVID SLAUGHTER, AND LEE WILLIAMS UNDER FEDERAL RULE OF EVIDENCE 702**

Plaintiff Lee Ho Village Townhome Association (the "Association") moves under Federal Rule of Evidence 702 to exclude or limit specified opinions of Defendant Ohio Security Insurance Company's retained experts Bradley East, P.E. (Polaris Forensics), David Slaughter (Halliwell), and Lee Williams (LFG Building Consultants).

## I. NATURE AND STAGE OF THE PROCEEDING

This is a first-party property insurance action arising from Hurricane Beryl's July 8, 2024 passage over the Association's six-building, seventy-six-unit townhome community. Ohio Security designated Mr. East, Mr. Slaughter and Mr. Williams as retained experts (Ex. 12), and the Association deposed each. Discovery closed September 21, 2026. The scheduling order requires that motions "to exclude or limit expert testimony under Fed. R. Evid. 702" be filed by the motion deadline (Doc. 15 ¶ 5), which is October 19, 2026. (Doc. 31.) This motion is timely.

## II. STATEMENT OF THE ISSUES

1. Whether Ohio Security's experts may offer unit-specific opinions that interior damage in units they never entered was caused by something other than wind, or predated the storm.

2. Whether Mr. East may testify generally that interior staining predated Hurricane Beryl when he cannot identify any unit other than Unit 312 in which a roof leak caused pre-storm staining and did nothing to confirm the theory.

3. Whether Mr. East may suggest that some unidentified "wind event" other than Beryl damaged the roofs, based on a twenty-year, county-wide storm list that does not even include Hurricane Beryl.

4. Whether Mr. Williams, an estimator who made no causation determination, may testify about causation.

5. Whether Ohio Security's adjuster may offer expert opinions beyond those "contained in the estimates, photo reports and claim notes prepared by him," and whether an unnamed corporate representative, designated without identifying a witness or an opinion, may give expert testimony.

6. Whether the retained experts may offer opinions first voiced at deposition, and whether any Ohio Security witness may offer mitigation opinions after Ohio Security withdrew its designated mitigation expert.

## III. SUMMARY OF THE ARGUMENT

Rule 702 now requires the proponent to show, more likely than not, that each opinion rests on sufficient facts and reflects a reliable application of method to those facts. Ohio Security cannot make that showing for four categories of opinion.

First, Ohio Security's adjuster and experts together entered 29 of 76 units. No defense expert observed the interiors of the rest, and Mr. East has not made, and testified he has no intention of making, unit-specific determinations from the documents he had. Opinions about what caused conditions no defense expert has seen or analyzed are not based on sufficient facts. Second, Mr. East's opinion that interior staining "existed pre-Beryl" is connected to the record only by his say-so: other than Unit 312, he cannot name a unit with a pre-storm roof leak, the only other documents he could find describe a washer-and-dryer leak, kitchen-cabinet damage and a tenant's comment about one unit, and he did nothing to test the theory. Third, his "multiple wind events" testimony does not fit the case: he ties no event to this property, his only dating tool cannot see missing shingles, and the NOAA storm list he relies on does not capture Hurricane Beryl itself. Fourth, Mr. Williams expressly adopted Mr. East's causation conclusions and made none of his

own. Each category should be excluded; the experts' remaining opinions are not challenged here, except as set out in Sections E and F.

Finally, two disclosure problems compound the first. Ohio Security's designation of its adjuster confines his opinions to those "contained in the estimates, photo reports and claim notes prepared by him"; its designation of an unnamed corporate representative identifies neither a witness nor an opinion; and each retained expert offered opinions at deposition that appear nowhere in his report. The adjuster should be held to the opinions in his claim file, the corporate representative to fact testimony, and the retained experts to their reports; and because Ohio Security withdrew its only mitigation expert without ever serving his report, no Ohio Security witness should offer opinions on the reasonableness or cost of mitigation.

## IV. RELEVANT FACTS

*Access.* Ohio Security's adjuster photographed thirteen unit interiors in 2024; Polaris, Halliwell and LFG list the units they entered on April 22, 2025 and March 31, 2026. (Ex. 2, OSIC_LEE HO_000308–000374; Ex. 3, Polaris Rpt. at 3; Ex. 5, Halliwell Rpt. at 2 (first page so numbered) & App. D; Ex. 7, LFG Rpt. at 2–3 of 11.) Together they entered 29 of 76 units. Forty-six units — 101, 102, 103, 109, 110, 111, 112, 201, 204, 206, 207, 208, 210, 211, 212, 214, 302, 303, 305, 306, 308, 309, 312, 406, 407, 408, 409, 410, 411, 501, 502, 504, 507, 508, 509,

510, 511, 512, 602, 603, 605, 606, 607, 609, 610 and 612 (the "Unentered Units") — appear on no defense access list or photo log. (Unit 601 also appears on no list or log, but the adjuster's 2024 report names it among units with drywall damage, so it is not included. (Ex. 2, OSIC_LEE HO_000213.)) LFG "was unable to access the majority of units." (Ex. 7, LFG Rpt. at 5 of 11.) Mr. Slaughter called access "our biggest limitation," testified that "there was not access to the majority of the property," and was never contacted to schedule a second inspection. (Ex. 6, Slaughter 55:10–56:02, 62:19–20, 63:05–06.)

*Mr. East's interior opinions.* Polaris concludes that "[t]he remaining interior moisture distress at the subject site is unrelated to . . . a wind-created opening" and that "the majority of the interior moisture distress is unrelated to a singular weather event." (Ex. 3, Polaris Rpt. at i, 12.) At deposition Mr. East testified:

- he cannot say which accessed units did or did not have interior staining consistent with a roof leak, and "can't like segregate from one to the other whether it was unrelated to a roof leak or whether it was related to a roof leak" (Ex. 4, East 88:03–10, 91:10–92:08);

- he "cannot specifically segregate each individual unit for each individual stain and tell you whether it existed pre-Beryl," and cannot identify for the jury which units had staining before Beryl (93:24–95:17), naming only Unit 312 (114:12–115:15);

- asked what supports that opinion, he named a 2021 real-estate inspection report for Unit 312 and aerial images showing roof repairs (99:15–21); asked for any other document, he said, "I remember reading it. Where it is, I don't know." (105:21–22). After searching his file during the deposition, he identified only three more: an adjuster photograph attributing a ceiling stain to a washer and dryer, a note in a

report by the Association's consultant (FIH) of kitchen-cabinet damage "not storm related" in Building 3, and an FIH note that a tenant in Unit 602 said an area was "old water damage that was poorly fixed." He agreed those were the only documents he could find. (107:05–108:15.) None describes a pre-storm roof leak;

- asked whether he did anything to confirm his theory that old leaks left unrepaired stains, he answered "No," and asked why not, "I don't know" (110:09–14);
- he interviewed no owner, occupant or Association representative (70:15–25, 72:10–21);
- he has "no intention" of developing an opinion that segregates the stains in any unit as pre- or post-Beryl (180:01–19);
- he was not asked to segregate pre-storm from post-storm damage. (116:18–117:02.)

*Mr. East's timing testimony.* Polaris states that "based on Polaris's weather research, multiple wind events were recorded in Harris County prior to and following Hurricane Beryl," and therefore it "is unable to pinpoint an exact date(s) of loss for this damage." (Ex. 3, Polaris Rpt. at 8.) Appendix II of the report contains CompuWeather maps of Hurricane Beryl and a printout of NOAA storm-event entries for all of Harris County from 2006 through 2025. (Id. at 4–5 & App. II.) The NOAA printout contains no entry between May 30, 2024 and December 26, 2024 — it does not list Hurricane Beryl. (Id., App. II.) Polaris also states that missing shingles "are not discernible" in the historical imagery. (Id. at 8.) Mr. East's only step to date the roof damage was to review those images (Ex. 4, East 143:05–13); he agrees Beryl's winds could have created every opening he

found (158:01–07); and he offers no opinion that any opening predates Beryl. (142:05–24, 149:16–18, 157:12–25, 158:18–159:04, 163:09–23, 165:18–166:07.)

*Mr. Williams.* Ohio Security designated Mr. Williams to testify to "the causes" of damage and "what damages were related to the claimed cause of loss as a result of Hurricane Beryl versus other causes." (Ex. 12, Second Am. Designation at 7.) He testified: "I relied on others as far as the determination of causation"; agreed that those determinations were "done by someone else you're relying upon"; that Mr. East "was the only individual"; and that he "would defer to him to answer anything contained in his report." (Ex. 8, Williams 88:17–19, 89:17–22, 90:16–22, 91:03–20, 106:21–107:02, 131:09–17.)

## V. STANDARD

An expert may testify only "if the proponent demonstrates to the court that it is more likely than not that" the testimony will help the trier of fact, "is based on sufficient facts or data," "is the product of reliable principles and methods," and "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. "The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence." *Kim v. Nationwide Mut. Ins. Co.*, 614 F. Supp. 3d 475, 486 (N.D. Tex. 2022). Relevance requires "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591–92

(1993). And "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The Association recognizes that disputes about the weight of an expert's sources are for the jury. But the 2023 amendment to Rule 702 was adopted because "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility," and "[t]hese rulings are an incorrect application of Rules 702 and 104(a)." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. This motion does not challenge the weight of any opinion grounded in facts that these experts, or anyone acting for Ohio Security, actually observed, measured, or photographed. It challenges opinions for which they have no facts at all, opinions they cannot connect to the data they cite, and opinions they disclaim.

## VI. ARGUMENT

### A. No defense expert may attribute interior damage in a unit he never entered to a non-covered cause.

Ohio Security's experts concede that they could not see most of the property. (Facts, *Access*.) For the forty-six Unentered Units, no defense expert made any observation, measurement, photograph, moisture reading, or interview. An expert

may rely on facts gathered by others, Fed. R. Evid. 703, and Ohio Security's experts had the Association's consultants' unit-by-unit reports. But Mr. East has not used those reports to say, unit by unit, which stains were roof-related or pre-existing, and he testified that he has no intention of doing so. (Ex. 4, East 180:01–19.) (Facts, *Mr. East's interior opinions*.) Without either first-hand observation or a unit-specific analysis of someone's data, there is no basis for attributing a particular unit's damage to a particular non-covered source (a supply line, an air handler, a window) that no one has examined. Such an opinion is not "based on sufficient facts or data." Fed. R. Evid. 702(b).

Polaris's conclusions that "[t]he remaining interior moisture distress" is unrelated to any wind-created opening, and that "the majority" of it is unrelated to a single weather event, are offered property-wide. But Mr. East could not identify, even for the units he did enter, which stains were roof-related and which were not, or which predated the storm. (Facts, *Mr. East's interior opinions*.) If he cannot make that call in a unit he entered, he cannot make it in a unit he never saw.

Halliwell's report concludes that "[b]ased on the limited number of units inspected, there did not appear to be wide-spread impacts related solely to a single weather-related event, such as Hurricane Beryl." (Ex. 5, Halliwell Rpt. at 11.) That is an extrapolation from 17 entered units to 76 (Ex. 5, Halliwell Rpt. at 2 (first page so numbered) & App. D), which Mr. Slaughter himself described as a "limitation"

because "there was not access to the majority of the property." (Ex. 6, Slaughter 55:20–56:02.) Halliwell identifies no sampling method that would make the 17 units available that day representative of the other 59; Mr. Slaughter described only walking to vacant units or units where a tenant was home and trying to get "as much representativeness . . . as we could." (Ex. 6, Slaughter 58:08–15, 63:23–64:02.)

Halliwell's report also attacks the Association's evidence directly. It concludes that "the FIH reports should not be relied upon to determine the extent of storm-related impacts from Hurricane Beryl." (Ex. 5, Halliwell Rpt. at 9.) The FIH reports are the unit-by-unit documentation of the Unentered Units, and if that opinion is not confined, Mr. Slaughter will do at trial what this motion seeks to prevent: tell the jury that the only contemporaneous record of those interiors is unreliable, from a witness who never saw them. The opinion rests on the same extrapolation. Halliwell reached it by comparing the 17 units it entered against FIH's six building reports (id.); its conclusions "are based on the access that we were granted and the evidence that we could collect" (Ex. 6, Slaughter 55:20–56:02); and Mr. Slaughter agreed that FIH's October 2024 inspection is "the only timestamp that we have for comparison purposes." (Id. 171:11–16.) As applied to the Unentered Units — interiors FIH documented twelve weeks after the storm and Halliwell never saw — the opinion has no factual basis at all.

Mr. East, Mr. Slaughter and Mr. Williams should be precluded from testifying that interior damage in any Unentered Unit was caused by any non-covered cause (including plumbing, HVAC, gutters, balconies, windows, wear, deferred maintenance or prior leaks) or predated Hurricane Beryl, except that Mr. East may testify about the specific documents described in Section B. Mr. East should also be precluded from offering, as to any unit he did not enter, the conclusions that "[t]he remaining interior moisture distress at the subject site is unrelated to . . . a wind-created opening" and that "the majority of the interior moisture distress is unrelated to a singular weather event"; and Halliwell's opinions that there were no "wide-spread impacts" and that the FIH reports "should not be relied upon" should be excluded as to the Unentered Units.

**B. Mr. East's opinion that interior staining "existed pre-Beryl" is *ipse dixit*.**

Mr. East's position is that "some of that staining existed pre-Beryl." (East 93:24–25.) He cannot say where. Other than Unit 312, he cannot identify any unit in which a roof leak caused staining before the storm. (Id. 93:24–95:17, 114:12–115:15.) He pointed to a 2021 real-estate inspection of Unit 312 and to aerial images showing that the roofs had been patched. (Id. 99:15–21.) After searching his file, he found only three other documents: a washer-and-dryer leak, kitchen-cabinet damage, and a tenant's comment about old water damage in Unit 602. (Id. 107:05–108:15.) None describes a pre-storm roof leak. Asked whether he

did anything to confirm that earlier leaks, rather than Beryl, left the stains, he said "No," and could not say why. (Id. 110:09–14.) He interviewed no one who lived there. (Id. 70:15–25, 72:10–21.)

Evidence that roofs were patched before 2024 is not evidence that any particular ceiling stain predates July 2024; the inference requires a step Mr. East admits he never took. That is the "analytical gap" *Joiner* describes, 522 U.S. at 146, and it is not closed by Mr. East's credentials. Mr. East may testify about the specific conditions described in the documents he identified: the 2021 report for Unit 312 and the three documents he found at his deposition. He should be precluded from offering the general opinion that interior staining at the property predated Hurricane Beryl, and from attributing pre-storm staining to any other unit.

**C. Mr. East's "multiple wind events" testimony does not fit the case.**

Polaris's statement that it cannot "pinpoint an exact date(s) of loss" because "multiple wind events were recorded in Harris County" would invite the jury to speculate that some other storm caused the roof damage. The opinion lacks the "valid scientific connection to the pertinent inquiry" that Rule 702 requires. *Daubert*, 509 U.S. at 591–92.

First, the data do not concern this property. The list covers every reported wind entry across all of Harris County for twenty years; Mr. East ties none of them to 9400 Bellaire Boulevard. Second, the list cannot be a reliable proxy for storms

that struck the property, because it omits the one storm everyone agrees struck it: there is no entry between May 30 and December 26, 2024, and so the search did not capture Hurricane Beryl itself. (Facts, *Mr. East's timing testimony*.) Third, the only other tool Mr. East used — historical aerial imagery — cannot, by Polaris's own account, show missing shingles. (Id.) Fourth, Mr. East agrees Beryl's winds were capable of creating every opening he found and offers no opinion that any of them predates Beryl. (Id.)

This is not a case in which an expert's affirmative opinion that a particular storm caused the damage is merely weakened by his inability to rule out other storms, a matter that goes to weight. *See Kim*, 614 F. Supp. 3d at 487. Here the suggestion of another storm is itself the opinion offered: Mr. East uses the NOAA printout as an affirmative reason to believe that a different storm may have caused the damage. Whether that suggestion rests on "sufficient facts or data" and "reflects a reliable application" of method to this property is a question of admissibility that Ohio Security must answer. Fed. R. Evid. 702(b), (d).

An expert may say he does not know the date of damage. He may not, under the banner of expertise, suggest to the jury that an unnamed other storm is a likely culprit when his data cannot support that inference. Mr. East should be precluded from testifying, or suggesting through the NOAA printout, that any identified or

unidentified weather event other than Hurricane Beryl caused any wind damage to the roofs. Fed. R. Evid. 702(a), (d); see Fed. R. Evid. 403.

**D. Mr. Williams may not offer causation opinions.**

Ohio Security designated Mr. Williams to testify to causation. (Ex. 12 at 7.) Under oath, he disclaimed any causation analysis: he "relied on others as far as the determination of causation," Mr. East "was the only individual," and he "would defer to him to answer anything contained in his report." (Facts, *Mr. Williams*.) An estimator who adopts another witness's causation conclusions wholesale has no reliable principles or methods of his own to apply on that question. Fed. R. Evid. 702(c)–(d). Mr. Williams should be precluded from testifying that any damage was or was not caused by Hurricane Beryl, wind, or any other cause, and from testifying that conditions in any unit he did not inspect are not storm-related. This limitation does not reach his testimony about the scope and pricing of the repairs he estimated.

**E. Ohio Security's adjuster should be held to the opinions in his claim file, and its unnamed corporate representative may not testify as an expert.**

Rule 26(a)(2)(C) requires, for a witness not required to provide a written report, a disclosure stating "the subject matter on which the witness is expected to present evidence" and "a summary of the facts and opinions to which the witness is expected to testify." Ohio Security's designation of its adjuster, Quintaurus

Williams, supplies that summary by reference: it states that "[t]his individual's opinions are contained in the estimates, photo reports and claim notes prepared by him," and that his testimony "will address all topical areas contained within any and all reports" he created. (Ex. 12 at 2–3.) The Association takes Ohio Security at its word. The adjuster's estimate, photo reports and claim notes record what he observed and photographed at the property in 2024 and the coverage decision he made; they contain no opinion about the cause of conditions in any unit he did not enter, and no opinion that any interior damage pre-dated Hurricane Beryl or resulted from plumbing, HVAC or any other non-covered source. The designation's further list of "topic[s]" — "the timing of the alleged loss," "whether or not the storm . . . actually occurred," "the presence or absence of the damages alleged" — discloses no opinion on any of them. (Id.) The adjuster should be held to the opinions his claim file actually contains; he may not be used at trial to supply, for the Unentered Units, the causation opinion that Ohio Security's retained experts cannot. The designation of an unnamed "Designated Corporate and Rule 30(b)(6) Representative(s)" who "may also have specialized information . . . which may qualify as expert testimony" is different in kind: it identifies neither a witness nor an opinion, and discloses nothing to which a summary could attach. (Id. at 3–4.) Under Rule 37(c)(1), any corporate representative should be limited to facts within his personal knowledge.

**F. Opinions first offered at deposition are undisclosed, and no Ohio Security witness may fill the mitigation gap.**

Each retained expert testified that his report was complete and his opinions final. (Ex. 4, East 62:08–17; Ex. 6, Slaughter 80:12–14; Ex. 8, Williams 78:19–25.) Each then offered opinions at deposition that appear nowhere in his report.

Mr. Williams, whose report disclaims mitigation ("LFG was not tasked with evaluating mitigation estimates, which will be addressed by another expert," Ex. 7, LFG Rpt. at 6 of 11), testified that shrink-wrap "typically" costs "between 2.00 and 2.50" a square foot based on unnamed Florida vendors, that roof replacement runs "500 to $700 a square," and that the Association's post-storm roof wrap was unwarranted because "it just felt like it was really heavy for what should have happened as far as a temp repair." (Ex. 8, Williams 134:12–21, 137:06–138:13, 141:23–142:19.)

Mr. East, whose report contains no repair-method opinion, testified for the first time that the roofs "can be repaired." (Ex. 4, East 183:08–18.) Rule 26(a)(2)(B)(i) requires "a complete statement of all opinions the witness will express"; Rule 26(e) permits correction of a report, not its enlargement; and Rule 37(c)(1) excludes undisclosed opinions unless the failure was substantially justified or harmless. *See Hamburger v. State Farm Mut. Auto. Ins. Co.*, 361 F.3d 875, 883 (5th Cir. 2004). The expert deadlines in the scheduling order were never extended (Doc. 15 ¶ 2B; Docs. 21, 31), and the new opinions go to the Association's

mitigation claim of approximately $437,000, which no disclosed Ohio Security expert addresses: Ohio Security withdrew Clifford Barrows, the expert it designated for mitigation, without ever serving a report (Ex. 12 at 8–9), and Mr. Williams, Mr. Slaughter and Mr. East each disclaimed any opinion on the reasonableness or cost of mitigation. (Ex. 8, Williams 57:03–21; Ex. 6, Slaughter 39:13–40:22; Ex. 4, East 49:09–22.) The Court should hold the retained experts to their April 2026 reports and preclude any Ohio Security witness from offering opinion testimony on mitigation.

## VII. CONCLUSION AND RELIEF REQUESTED

The Association asks the Court to grant this motion and enter the accompanying proposed order:

1. precluding Mr. East, Mr. Slaughter and Mr. Williams from testifying that interior damage in any of the forty-six Unentered Units was caused by any non-covered cause or existed before Hurricane Beryl, except as permitted in paragraph 2, precluding Mr. East from offering, as to any unit he did not enter, Polaris's conclusions that "[t]he remaining interior moisture distress" is unrelated to a wind-created opening and that "the majority" of it is unrelated to a singular weather event, and excluding, as to the Unentered Units, Halliwell's opinions that "there did not appear to be wide-spread impacts related solely to a single weather-related event" and that the FIH reports "should not be relied upon";

2. precluding Mr. East from offering the general opinion that interior staining at the property existed before Hurricane Beryl, and limiting any testimony that pre-storm staining exists in a particular unit to the conditions described in the 2021 inspection report for Unit 312 and the three documents he identified at deposition (East 107:05–108:15);

3. precluding Mr. East from testifying, or suggesting through the NOAA printout in Appendix II of his report, that any weather event other than Hurricane Beryl caused wind damage to the roofs;

4. precluding Mr. Williams from offering any opinion on causation;

5. limiting Quintaurus Williams to the opinions contained in his estimates, photo reports and claim notes, and precluding any corporate representative of Ohio Security from offering expert opinion testimony;

6. precluding Mr. East, Mr. Slaughter and Mr. Williams from offering any opinion not stated in their April 2026 reports, including the opinions identified in Section F;

7. precluding any Ohio Security witness from offering opinion testimony on the reasonableness, necessity or cost of mitigation or emergency services; and

8. granting all other relief to which the Association is entitled.

Dated: October 19, 2026

Respectfully submitted,

**NATIONAL INSURANCE ADVOCATES, LLP**

/s/ Anthony Pastor
Anthony Pastor
Attorney-in-Charge
Texas Bar No. 24144592
S.D. Tex. Bar No. 3931133
service@nia.law

6619 S. Dixie Hwy, #363
Miami, Florida 33143
Telephone: 833-701-4110

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF CONFERENCE**

I certify that on October 19, 2026, at 11:11 a.m. Eastern, I conferred by telephone with lead counsel for Defendant, Kolby Keller of Thompson, Coe, Cousins & Irons, LLP, describing the relief requested in this motion and asking for Defendant's position. Defendant opposes the motion.

/s/ *Anthony Pastor*
Anthony Pastor

**CERTIFICATE OF WORD COUNT**

I certify that this motion contains 4,386 words, excluding the case caption, table of contents, table of authorities, signature block, and certificates, and therefore complies with the 5,000-word limit of Section 16(c) of the Court Procedures of the Honorable Nicholas J. Ganjei.

/s/ Anthony Pastor
Anthony Pastor

**CERTIFICATE OF SERVICE**

I certify that on October 19, 2026, a true and correct copy of the foregoing document and all exhibits thereto was filed with the Court's CM/ECF system, which will send notice of electronic filing to all counsel of record, including counsel for Defendant, Jonathan Peirce and Kolby Keller, Thompson, Coe, Cousins & Irons, LLP.

/s/ Anthony Pastor
Anthony Pastor

## INDEX OF EXHIBITS

Each exhibit is filed as a separate attachment with a cover sheet. Court Procedures § 16(g). Exhibit numbers match those used in Plaintiff's Motion for Partial Summary Judgment filed the same day.

| Ex. | Description |
|---|---|
| 2 | Ohio Security claim-file excerpts, OSIC_LEE HO_000200, 000209–000215, 000308–000374 |
| 3 | Polaris Forensics, Inc., Multi-Family Wind Distress Evaluation (Bradley L. East, P.E.) (Apr. 27, 2026), including Appendix II |
| 4 | Deposition of Bradley East (July 13, 2026) (excerpts) |
| 5 | Halliwell Engineering Associates, Assessment Report HEA.009510.MI (Apr. 28, 2026) |
| 6 | Deposition of David Slaughter (July 20, 2026) (excerpts) |
| 7 | LFG Building Consultants, Scope and Value Expert Report (Lee Williams) (Apr. 28, 2026) (narrative report) |
| 8 | Deposition of Lee Williams (July 13, 2026) (excerpts) |
| 12 | Defendant's Second Amended Designation of Expert Witnesses (July 22, 2026) |